**FILED** OCT 19 2001
CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION AT SANTA ANA
BY _____ DEPUTY

Priority ✓
Send ✓
Enter ___
Closed ___
JS-5/JS-6 ___
JS-2/JS-3 ___
Scan Only ___

# UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Michael Russ,<br><br>　　　　Plaintiff(s),<br><br>　　v.<br><br>PacifiCare Health Systems, Inc.; Alan R Hoops; Robert W. O'Leary; Mary C. Langsdorf; Howard A. Phanstiel; Bradford A. Bowlus; Craig T. Beam; Richard M. Budge, Sr.; David R. Carpenter; Gary L. Leary; Warren E. Pinckert II; Jeffrey M. Folick; Joseph S. Konowiecki; Craig S. Schub; Robert N. Franklin; Mitchell J. Goldstein; and Unihealth Foundation,<br><br>　　　　Defendant(s). | CASE NO. SA CV 00-1147 DOC (EEx)<br><br>**O R D E R** GRANTING MOTION TO DISMISS |

ENTER ON ICMS
OCT 23 2001

Before the Court are Defendants PacifiCare Health motion to dismiss and Defendant Unihealth joinder and supplemental motion to dismiss. The Court deems this matter appropriate for resolution without oral argument. Fed. R. Civ. P. 78; Local Rule 7-15. Accordingly, the

hearing set for October 22, 2001 is removed from the Court's calendar. After consideration of all papers, the COURT GRANTS the motion.

I. Introduction

Plaintiff Michael Russ was a shareholder of Defendant PacifiCare Health System (PacifiCare) during the class period of October 27, 1999 to October 10, 2000. He alleges that during that time, individual Defendants knowingly misrepresented PacifiCare's true financial condition, painting a much more optimistic picture than was warranted by the company's actual status. As a result, on October 10, 2000, the price of PacifiCare's stock fell from 34 3/4 to as low as 14 5/8.

At some point prior to the Class Period and during the Class Period, PacifiCare was in the process of switching from a capitation system of payment to its providers (also known as doctors), which provides a maximum amount the insurance company will pay for services provided by the doctors, to a "shared risk" system. Under the shared risk system, the amount that PacifiCare may have to pay the doctors is not fixed as under the capitation system, but rather is dependent on the services actually provided by the physicians or other health care providers. For purposes of this matter, the key difference is that under the old system, PacifiCare's payout obligations were fixed and thus more readily predictable, whereas under the new system, the obligations were not fixed but rather depended on actual use of health services by members.

Russ alleges that Defendants positive statements' about the financial health of PacifiCare were false because it was facing rising and uncertain claims cost as a result of the change to a shared-risk system and because its Medicare business had become unprofitable. He alleges that the Medicare business was known to be unprofitable because all but three of PacifiCare's Medicare businesses were operating at a loss and that at one point, it lost 40% of its membership.

II. Discussion

A successful fraud claim must establish (1) a misrepresentation, omission, or other fraudulent device; (2) the purchase or sale of securities in connection with the fraudulent device; (3) the defendant's scienter at the time of the misrepresentation or omission; (4) the materiality

of the misrepresentation or omission; (5) justifiable reliance by plaintiff; and (6) damages. *See* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. Under the Private Securities Litigation Reform Act (PSLRA), Russ must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. §78u-4(b)(1).[1]

### A. False Statements

Russ identifies numerous press releases, conference calls and SEC documents which contain statements concerning PacifiCare's financial condition. The positive statements are alleged to be false primarily because Defendants knew that Medicare business had become unprofitable and that its claims payouts were not accurately forecasted.

#### 1. Forward-looking Statements

As a preliminary matter, Defendants argue that many of the statements are forward looking statements and hence protected by the "safe harbor" provisions of the PSLRA. The PSLRA provides a "safe harbor" for forward-looking statements, so long as the statements are identified as forward-looking and are "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(B). A forward-looking statement is defined in relevant part as a

> "(A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items; (B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer; (C) a statement of future economic

---

[1] The Court GRANTS Defendant Unihealth Foundation's motion to dismiss. Russ's allegations that Unihealth's sale of PacifiCare stock and a statement made by Unihealth's president that the company remained optimistic about PacifiCare does not state a claim under the PSLRA. There are no allegations of any kind against Unihealth other than a boilerplate allegation that it was part of a group that misled investors. However, no act or statement by Unihealth is alleged.

performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission."

Here, many of the statements alleged to be false are forward-looking statements. They provide revenue projections and plans and objectives relating to PacifiCare's services. Russ's argument that they are not forward looking statements because they concerned the current state of the company is unavailing because while the statements may contain aspects of the current state of affairs, they are predominantly projections and statements about the future of the company.[2]

The forward looking statements contained in press releases, annual reports and SEC documents are accompanied by meaningful warning language, thus coming within the safe-harbor provision. For example, in a 10-K filed with the SEC, PacifiCare provided that it intended to raise premiums and that doing so could cause a loss of profitable membership. It also forecasted continued decreases in capitated agreements and a corresponding need to increase premiums, reduce benefits and increase co-payments. The 10-K also specified that increases in medical care ratios (the percentage of premiums used to cover health care costs) could be caused by the mix of capitated and shared-risk contracts, inability to successfully implement medical management initiatives and the termination of provider contracts.

---

[2] Even if construed as statements about present conditions, they are not actionable because they are too vague to be taken seriously or relied on by investors. Enthusiastic comments by executives are typically discounted by the market. Statements such as PacifiCare "is poised for continued success," "Our efforts to build membership and improve operations continue to result in significant top and bottom-line growth," "Secure Horizons and Medicare is a very good business for PacifiCare" are too vague to be relied on by investors. Further, many of these statements are taken out of context. For example, the press release containing the language regarding membership contains specific numbers regarding PacifiCare's performance for the quarter as well as projections for future medical care ratios. That is, they were simply a gloss of the hard data immediately following in the same document.

Additionally, the document also stated that "We have and may continue to incur additional health care costs. The effect of these risks and the need for additional provider reserves could have a material effect on our results of operations or cash flows of a future period." Importantly, in later 10-Ks, PacifiCare provided different and additional risk factors, thus indicating that it was not simply inserting boilerplate cautionary language, but rather meaningful information.

Similarly, in press releases and phone calls with analysts, PacifiCare provided cautionary language. Importantly, it provided, for example, that "important factors" that could cause changes in forecasts included "actual medical claims results differing from current estimates." Russ argues that this is not sufficiently specific and that it fails to convey actual information possessed by Defendants at the time the statements were made. However, since Russ has specifically alleged that Defendants failed to disclose PacifiCare's claims problems, this disclosure is significant, particularly as it was repeated at each phone call, and in all but one of the press releases. What is also significant is that during at least one conference calls with analysts, information was disclosed that there had been a 50% increase in the amount of shared-risk contracts versus capitated contracts. (May 2, 2000 phone call). Thus, not only was cautionary language provided, but specific information allegedly hidden was fully disclosed.

That the documents also contained information about the current quarter does not detract from this conclusion. As discussed below, Russ's allegations that the financial information was knowingly false are not sufficiently particular. Therefore, the glosses on these numbers is also not actionable.

        2.   Medicare

Russ alleges that Defendants misrepresented PacifiCare's Medicare business. The statements alleged to be false are not supported by any other statements or information which indicates that they were false when made. For example, Russ alleges that Defendants did not disclose that 40% of its members had canceled their plans, or that only three of its Secure Horizons (the MediCare provider) offices were profitable. These statements, however, do not make positive statements false. There is no allegations that the 40% decline in membership caused any downturn in revenues; in fact, it could have been a benefit in that it would mean less

claims to be processed and thus less exposure to greater expenses. Similarly, Russ does not allege how many Secure Horizon branches were operational at the time that all but three were running at a loss and thus knowing that only three were profitable does not provide enough information. In addition, those three–San Diego, Los Angeles and Orange County–are in heavily populated areas. Thus, even if were the case that most offices were not profitable, it could be that the three profitable ones more than made up for the losing offices. Finally, while Russ identifies statements made by several of the Individual Defendants regarding the strength of PacifiCare's MediCare business, he does not correlate the timing of those statements with the reduction in membership or the time period of alleged operating losses.

### 3. Capitation and Claims payout

Russ alleges that the Individual Defendants omitted pertinent information about PacifiCare's rising costs as a result of its change to a shared risk system, and that PacifiCare was ill equipped to handle the change internally. PacifiCare did in fact disclose such information. As noted above, information concerning the change to a shared risk system was fully disclosed, as well as potential problems with increased costs a commensurate result. Further, PacifiCare noted the general problem of rising health costs and the impact it would likely have on medical ratios. Aside from boilerplate allegations, Russ does not allege that individual defendants had knowledge that was not released to the public.

### 4. Financial Statements

Russ also alleges that the financial statements issued by PacifiCare were false when issued because they were the result of deliberate delay in the processing of claims; by delaying or stalling claims payments, PacifiCare was able to make its numbers appear stronger than they were. However, Russ provides no independent information that the financial statements are false other than the allegations he is trying to prove, that they are false because they reflect PacifiCare's claim manipulations. Further, that the medical cost ratios increased in the year following the class period does not tend to prove that the previous year's results or forecasts were deliberately falsified. This is particularly so when PacifiCare's stock price rose in the three to six months following the class notice to as high as $40 a share, when the market had full

knowledge of the new figures reflecting the higher costs.

While Russ is not required to prove his case at this stage of the litigation, he is required to allege facts to show that the financial statements were knowingly false; merely alleging that they were false because Defendants allegedly had access to information which rendered them false is not sufficient. For example, Russ argues that PacifiCare overestimated its net income by $16 million, earnings by $0.45 and earnings growth by 27.7%. His basis for this is that PacifiCare had "pushed out" medical expenses as evidenced by later lawsuits and complaints concerning late claim payment and that therefore the numbers were inaccurate. That other lawsuits or complaints have been filed are not facts upon which Russ can rely. As Defendants point out, PacifiCare is vigorously contesting the claims, and at least one proceeding involves many HMOs and insurance companies for allegedly slow claims processing, not just PacifiCare.

B.  Scienter

To satisfy the scienter prong of PSLRA, Russ's allegations must present a "strong inference" of scienter, not direct proof. *Helwig v. Vencor*, Inc., 251 F.3d 540 (6th Cir. 2001). The allegations must show either that Defendants knew at the time of the false statements that they were false, or were reckless in not knowing the falsity.

1.  Insider Stock trading

Insider stock activity may be circumstantial evidence of knowledge of falsity and that statements were false when made. *Silicon Graphics*, 183 F.3d at 986. Factors to be considered are (1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history. *Id.* at 986. Here, Russ alleges that the individual defendants' sales activities were not consistent with prior history and constituted significant percentages of their holdings. However, a close examination of each defendant reveals that their sales do not support a strong inference of scienter. In addition, several of the defendants sold no stock at all.

Defendants Beam, Carpenter, and Konowiecki's sales totaled just over 2.24%, 10.6% and 10.4% of their holdings, respectively, leaving the great majority of their holdings intact. This is too low a percentage to be considered suspicious. *Silicon Graphics*, 183 F.3d at 987. Defendant

Hoops sold only 3.51%, and had sold almost twice as many shares in the year prior to the Class Period. While Burdge and Leary sold 24.47% and 21.19% of their holdings, they were outside directors and there are no allegations that they made any false statements. In addition, their sales took place four and five months prior to the announcement of lower earnings, thus negating an inference of scienter based on the timing of the sales.

Pinckert sold 15% of his holdings in August of 2000. Russ does not allege that the sale was dramatically out of line with his previous sales. Moreover, after the sale, he still retained 85% of his holdings. With respect to Folick and Franklin, they sold less than well under 5% of their holdings, taking into account their options at the time, and there are no allegations that their sales were out of line with their previous selling history. Further, there are no specific allegations against these individual defendants beyond insufficient boilerplate allegations. *See Silicon Graphics*, 183 F.3d at 987-88 (director's sale of large percentage of holdings not necessarily significant when, inter alia, director had no day-to-day involvement in corporation).

### 2. Other indicia

Other indicia of scienter are also lacking. Allegations that "each of the Defendants was personally familiar with PacifiCare's revenues and earnings as they monitored PacifiCare's revenues and medical expenses" are inadequate to the task as at least several of the Defendants were directors against whom there are no specific allegations that they signed any reports or had access to internal reports on a regular basis. Further, the only defendants identified by name are Langsdorf and Phanstiel as directing PacifiCare's Finance Department which allegedly generated certain reports. There are no allegations against identified individual defendants which would suggest that they knew or should have known that their positive statements about PacifiCare were false. Instead, Russ relies on boilerplate language that "they [individual Defendants] ran PacifiCare as 'hands-on' managers, dealing with important day-to-day issues facing PacifiCare's business" and that "each of the Individual Defendants was personally familiar with PacifiCare's revenues and earnings as they monitored PacifiCare's revenues and medical expenses." This does not satisfy the specificity required by the PSLRA. *In Re Autodesk, Inc. Sec. Litig.*, 132 F. Supp. 2d 833, 844 (N.D. Cal. 2000) (pleading requirements not

1  satisfied when knowledge attributed to defendant by virtue of their "hands on" status). This type
2  of allegation is particularly deficient with respect to the director defendants.

3  Russ argues that because the California Medical Association (CMA) began investigating
4  the company's practices four months after the end of the Class Period that individual defendants
5  should have known that PacifiCare had deliberately delayed payment of claims. That after the
6  end of the Class Period, the CMA investigated PacifiCare for allegedly underpaying claims does
7  not support a strong inference that all the individual defendants knew that PacifiCare had
8  underpaid its claims during the Class Period and that doing so ultimately would have a
9  detrimental effect on the company. Equally importantly, Russ has not alleged any facts which
10 would indicate, which, if any, of the individual defendants had knowledge of the alleged
11 underpayments. The fact that a former employee says that "everyone knew" that there were
12 problems is not sufficient to show specific knowledge of specific defendants.

13 Nor does the cease and desist order issued by the California Department of Managed Care
14 in February of 2001 support an inference that Defendants knew or should have known that there
15 were problems with its claims process during the Class Period. Russ notes that the cease and
16 desist order mentions PacifiCare's "corrective steps relating to its inadequate claims processing
17 system." There is no indication of what these steps were or what indeed they related to, who
18 initiated any such steps and when they were initiated. Nor even if PacifiCare had taken such
19 steps, and the individual defendants were aware of those actions, does it follow that they knew
20 that the underlying problems rendered any positive statements false.

21     C.    Rule 20(a) claim

22 Defendants seek dismissal of Russ's Rule 20(b) allegations, arguing that he fails to allege
23 one of two elements. Rule 20(a), or control person liability, requires a primary violation of Rule
24 10b-5 and that the individual defendants and that the alleged controlling person possessed the
25 power to direct the individual responsible for the primary violation. Russ's allegations regarding
26 the primary violation are, as discussed at length above, insufficient. Therefore, his claim for
27
28

control person liability also fails.[3]

III. Disposition

The Court GRANTS Defendants' motion to dismiss. Russ has until November 23, 2001 to file an amended complaint consistent with this Order.

IT IS SO ORDERED.

DATED: October 19, 2001

*David O. Carter*<br>
DAVID O. CARTER<br>
United States District Judge

---

[3] With respect to the defendants who were officers, Russ has properly pled that the individual defendants exercised control over PacifiCare. That is sufficient for a Rule 20(b) claim. *In Re Splash Tech. Holdings, Inc. Sec. Litig.*, 2000 WL 1727405 at 16 ("the focus turns on whether the defendant, acting alone or as a member of an identifiable group, had the power or influence to direct significant aspects of the management of the corporation") (citations omitted). With respect to the director defendants, Russ has not satisfied his burden.