Priority
Send
Enter
Closed
JS-5/JS-6
JS-2/JS-3
Scan Only

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

THIS CONSTITUTES NOTICE OF ENTRY AS REQUIRED BY FRCP, RULE 77(d)

## CIVIL MINUTES - GENERAL

Case No. SACV 00-1147 DOC (EEx)　　　　　　　　　　　　　　　Date: April 17, 2002

ENTERED
APR 18 2002
CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SANTA ANA OFFICE
BY DEPUTY

Title: Michael Russ, on behalf of himself and all others similarly situated, v. PacifiCare Health Systems, Inc., Alan R. Hoops, Robert W. O'Leary, Mary C. Phanstiel, Bradford A. Bowlus, Richard M. Budge, Sr., David R. Carpenter, Gary L. Leary, Warren E. Pinckert II, Jeffrey M. Folick, Joseph S. Konowiecki, Craig S. Schub, Robert N. Franklin and Unihealth Foundation.

---

PRESENT:

### THE HONORABLE DAVID O. CARTER, JUDGE

　　Kristee Hopkins　　　　　　　　　　　　　　Not Present
　　Courtroom Clerk　　　　　　　　　　　　　　Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFFS:　　ATTORNEYS PRESENT FOR DEFENDANTS:

　　NONE PRESENT　　　　　　　　　　　　　　NONE PRESENT

---

PROCEEDING (IN CHAMBERS): GRANTING MOTIONS TO DISMISS

　　　　Before the Court are Defendant PacifiCare Health Systems, Inc. and Individual Defendants' motion to dismiss and Defendant UniHealth Foundation's motion to dismiss for failure to state a claim under the Private Securities Litigation Reform Act (PSLRA). The Court finds that the matter is appropriate for decision without oral argument. Fed. R. Civ. P. 78; Local Rule 7-15. Accordingly, the hearing set for April 15, 2002 is removed from the Court's calendar. After reviewing the moving, opposing and replying papers, and for the reasons set forth below, the Court GRANTS the motions to dismiss.

## I.　BACKGROUND

　　　　Plaintiff Michael Russ was a shareholder of Defendant PacifiCare Health System (PacifiCare) during the period of October 27, 1999 to October 10, 2000 (Class Period). Pacificare is a

---

MINUTES FORM 11 DOC　　　　　　　　　　　　　　　　　Initials of Deputy Clerk _KH_
CIVIL - GEN　　　　　　　　　　　　　　　　　　　　　　　　　　　　　Page 1 of 15

☑ Docketed
☑ Copies/NTC Sent　ENTER ON ICMS
☑ JS - 5 / JS - 6
☐ JS - 2 / JS - 3
☐ CLSD　　　　　APR 18 2002

healthcare services company that operates health maintenance organizations for members through two types of programs: (1) the Secured Horizons program for Medicare beneficiaries, and (2) commercial plans for members of employer groups and individuals. Plaintiff alleges that during the Class Period, individual Defendants knowingly misrepresented PacifiCare's true financial condition, painting a much more optimistic picture than was warranted by the company's actual status. On October 10, 2000, PacifiCare announced unanticipated shared-risk costs of approximately $70-$75 million for that quarter. Additionally, PacifiCare announced that medical claims reserves would be increased by approximately $25-$30 to account for changes in estimates for medical expenses incurred in prior quarters. Plaintiff characterizes this as an admission that PacifiCare's past statements and accounting reports were fraudulent. As a result of PacifiCare's October 10, 2000 announcement, the price of PacifiCare's stock fell from 34 3/4 to as low as 14 5/8.

During, and prior to, the Class Period, PacifiCare was involved in the process of switching from a capitation system of payment to its providers (also known as doctors) to a shared-risk system. A capitation system sets a maximum amount the insurance company will pay for services provided by the doctors, regardless of the services provided once that maximum amount is reached. Under a shared-risk system, the amount that PacifiCare pays to the doctors is not fixed, as under the capitation system, but rather is dependent on the services actually provided by the physicians or other health care providers. For purposes of this motion, the key difference is that under the old system, PacifiCare's payout obligations were fixed and thus more readily predictable, whereas under the new system, the obligations are not fixed but rather depend upon the health services actually provided to members.

Plaintiff focuses on two types of statements (1) those related to PacifiCare's transition from capitation contracts to shared-risk contracts, and (2) statements regarding the profitability and success of PacifiCare's Medicare contracts. Plaintiff alleges that Defendants' positive statements about the financial health of PacifiCare were false because it was facing rising and uncertain claim costs as a result of the change to a shared-risk system. He also alleges that despite Defendants' repeated statements regarding the value derived from providing Medicare services, the Medicare business was known to be unprofitable during the Class Period. Plaintiff claims that the unprofitability of Medicare was evident to Defendants at that time because of the recent passage of the Balanced Budget Act of 1997 and various internal reports.

On April 23, 2001, Plaintiff filed a consolidated class action complaint (CC) which was dismissed by Order of the Court on October 19, 2001. Subsequently, on December 3, 2001, Plaintiff filed a second consolidated class action complaint (SCC), the operative complaint in this action. Defendants again filed motions to dismiss and Plaintiff opposes.

In its October 19, 2001 Order, this Court considered at length Defendants' motions to dismiss the original consolidated complaint. To the extent that Defendants' current motions and Plaintiff's opposition repeat arguments that were made in the earlier motions to dismiss, the Court deems such arguments a motion for reconsideration subject to Local Rule 7-18. Rule 7-18 provides

that "no motion for reconsideration shall in any manner repeat any oral or written argument made in support of or in opposition to the original motion." The Court will, of course, consider those allegations from the original complaint in combination with new allegations, as this constitutes a material difference in fact. However, to the extent that Plaintiff rests on mere repetition of his original allegations and previous arguments, he has not shown a material difference in law or fact to justify reconsideration of the determination that the allegations are insufficient to satisfy the standards of 12(b)(6) and the PSLRA. To that extent, the Court reaffirms its October 19, 2001 Order.

## II.   DISCUSSION

Under Federal Rule of Civil Procedure 12(b)(6), a complaint can be dismissed when the plaintiff's allegations fail to state a claim upon which relief can be granted. The court must construe the complaint liberally, and dismissal should not be granted unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957); *see Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990) (stating that a complaint should be dismissed only when it lacks a "cognizable legal theory" or sufficient facts to support a cognizable legal theory). The court must accept as true all factual allegations in the complaint and must draw all reasonable inferences from those allegations, construing the complaint in the light most favorable to the plaintiff. *See Westlands Water Dist. v. Firebaugh Canal*, 10 F.3d 667, 670 (9th Cir. 1993); *Balistreri*, 901 F.2d at 699; *NL Industries, Inc. v. Kaplan*, 792 F.2d 896, 898 (9th Cir. 1986). Dismissal without leave to amend is appropriate only when the court is satisfied that the deficiencies of the complaint could not possibly be cured by amendment. *See Chang v. Chen*, 80 F.3d 1293, 1296 (9th Cir. 1996); *Noll v. Carlson*, 809 F.2d 1446, 1448 (9th Cir. 1987).

A successful fraud claim must establish (1) a misrepresentation, omission, or other fraudulent device; (2) the purchase or sale of securities in connection with the fraudulent device; (3) the defendant's scienter at the time of the misrepresentation or omission; (4) the materiality of the misrepresentation or omission; (5) justifiable reliance by plaintiff; and (6) damages. *See* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. Under the Private Securities Litigation Reform Act (PSLRA), Plaintiffs must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. §78u-4(b)(1). In addition, where allegations are based on information, "the complaint shall state with particularity all facts on which that belief is formed." *Id.* Although, plaintiffs are not required to identify each specific transaction which may be fraudulent. *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997).

### A.   False Statements

At the outset, the Court notes that the false statements in the SCC are identical to those alleged in the original consolidated complaint, the CC. (*Compare generally* SCC ¶¶ 74-102 *with* CC ¶¶

51-82.) Defendants thus argue that the Court's finding that the statements in the CC not actionable as forward-looking statements protected by the "safe harbor" provision of the PSLRA, applies equally to the SCC. Plaintiff, however, argues that the Court's prior ruling is inapplicable because the SCC does not rely on forward-looking statements, but rather false statements of existing or historical fact. To buttress this argument, Plaintiff attempts to characterize the statements in the SCC as differing from those in the CC by manipulating the excerpts included.

The CC relied on a series of press releases, financial reports and analyst statements as the basis for actionable SEC violations. These very same sources are included in the SCC and are quoted at length in both complaints. Specifically, Plaintiff directs the Court to the numerous, specific sections of the SCC as containing statements that were not previously examined in the context of the safe harbor: ¶¶ 74-76, 77-81, 83-84, 87-88, 90-96 and 99-102. After an examination of both complaints, the Court finds that these allegations correspond to the following paragraphs in the CC: ¶¶ 51-52, 54, 55-59, 61, 63, 66-67, 69-71, 73, 75-76, 79-82. The SCC contains no new language from these sources, but in the SCC Plaintiff has deleted some of the more explicitly future-oriented or predictive statements and replaced those quotations with ellipses. Compare, for example, SCC paragraph 74 with CC paragraph 51, where Plaintiff deleted the following future-oriented statement: "Our confidence in and outlook on the future is very positive. We plan to continue to take advantage of current market conditions to aggressively buy back our stock." Furthermore, a comparison of the same two paragraphs reveals that Plaintiff also excluded cautionary language and statements revealing increased costs or other negative financial statements. Paragraph 74 of the SCC is missing the following language from the quoted October 27, 1999 press release, although the language was quoted in the CC: "Medical claims and benefits payable increased to $744 million from $710 million at June 30, primarily due to membership shifting from the capitation to shared risk contracts." (*See* CC ¶ 51.) Similarly SCC paragraph 81, which quotes a February 10, 2000 press release, is missing a concluding sentence which states that PacifiCare's organization changes set "the stage for continued success in 2000 and beyond" and other sentences that reference the company's future outlook. Also noticeably absent is the portion of the press release acknowledging that medical claims and benefits payable "increased to $795 million at December 31, 1999 from $744 million at September 30, primarily due to membership shifting from capitation to shared-risk hospital contracts." (*See* CC ¶ 59.) In addition, Plaintiff has bolded and italicized different portions of the sources than those that were stressed in the CC.

The Court does not, however, accept that these cosmetic changes alter the substance of Plaintiff's allegations. The PSLRA provides a "safe harbor" for forward-looking statements, so long as the statements are identified as forward-looking and are "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(B). A forward-looking statement is defined in relevant part as:

> (A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share,

capital expenditures, dividends, capital structure, or other financial items; (B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer; (C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission. 15 U.S.C. § 78u-5(i)(1).

Again, the Court finds that Plaintiff's allegedly false statements are predominantly forward-looking statements protected by the safe harbor provision. Further, these statements are accompanied by meaningful warning language and many even disclose the data that Plaintiff asserts was fraudulently hidden. (*See, e.g.,* SCC ¶ 74 (noting that increasing costs due to the shift from capitation contracts to shared-risk contracts).) Because forward-looking statements rely on historical observations and assumptions, such assumptions are also protected by the safe harbor provisions. *Harris v. Ivax Corp.*, 182 F.3d 799, 806-07 (11th Cir. 1999); 15 U.S.C. § 78u-5(i)(1)(D). Moreover, to the extent that the statements in this case contain references to present conditions, many of the statements are too vague to be reasonably relied upon by investors. *See Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231, 1245 (N.D. Cal. 1998) ("Vague statements of opinion are not actionable under the federal securities laws because they are considered immaterial and discounted by the market as mere 'puffing.'");(*see also* Order at 4 n.2). In *Wenger*, for instance, the court pointed to such statements as "we're the leader in a rapidly growing market" and "we know our markets very well, we dominate these markets . . . and we're positioned to move forward now" as indicative of vague statements of optimism that are not actionable. 2 F. Supp. 2d at 1245.

Here, for example, Plaintiff stresses that Defendants assured investors that the shift to from capitation to shared-risk contracts "will benefit us and our providers." Even accepting Plaintiff's contention that Defendants knew the shift would result in increased costs, this statement is not objectively false. Plaintiff himself argues that PacifiCare was forced to shift to shared-risk contracts to maintain its contracts with providers, (SCC ¶ 46), thus the shift could be seen as a benefit to all parties despite increased costs. This analysis shows the difficulty of relying upon such a vague and general statement. Other examples that Plaintiff relies on include "PacifiCare's performance remains rock solid," (SCC ¶ 87), and "PacifiCare is in the strongest position as it has been for several years, and is poised for continued success." Again, these statements might be true despite increasing costs and diminished Medicare business. PacifiCare may have been in an superior position relative to its competitors and despite increasing costs, maintaining consistent performance via the members. Finally, in reference to medical cost ratio, Plaintiff quotes such statements as this one from a 10-K report: "We manage premium increases to offset health care cost increases to maintain long term stability in our medical care ratio." (SCC ¶ 84.) Even if Plaintiff was not maintaining a stable medical

care ratio,[1] this statement was not false. Plaintiff may, in fact, attempt to offset health care increases with premium increases, it just may not always be as successful as planned.

Plaintiff is correct that "optimistic statements can be actionable if not genuinely and reasonably believed, or if the speaker is aware of undisclosed facts that tend seriously to undermine the statement's accuracy." *Cooper*, 137 F.3d at 629. Such statements, however, are only actionable if "the complaint alleges that the [defendants] were aware of undisclosed facts that showed there was no reasonable basis for their forecasts, which they did not genuinely believe." *Id.* Thus, the Court considers if Plaintiff has sufficiently alleged that the more specific statements were false when made and Defendants knew, or had to reason to know, of their falsity.

## B.  Falsity of Statements

The PSLRA requires specific, contemporaneous events which contradict positive statements to show the falsity of statements. *Shuster v. Symmetricon, Inc.*, 1997 WL 269490, *3 (N.D. Cal. Feb. 25, 1997). In *In Re Glen Fed.*, the Ninth Circuit noted that plaintiffs may not always simply aver that a later "sobering truth" renders an earlier rosy statement false for the reason that unrelated events may be the cause of the discrepancies, such as decline in the stock market, shifts in consumer demand or appearance of a competitor. 42 F.3d 1541, 1548-49 (9th Cir. 1994). The court, in applying the even more lenient Rule 9(b) standard prior to application of the PSLRA, goes on to note that there are:

> Situations in which what separates the allegedly fraudulent statement and the later, apparently inconsistent statement is an event internal to the company, such as the revaluation of assets, or the recalculation of loan loss reserves. In such a situation, explanation as to why the statements were false when made might be provided simply by pointing to the later statements--but without additional explanation the mere existence of the later statements might not be enough. . . . The fact that an allegedly fraudulent statement and a later statement are *different* does not necessarily amount to an explanation as to why the earlier statement was false. . . . In order to allege the circumstances constituting fraud, plaintiff must set forth facts explaining why the difference between the earlier and the later statements is not merely the difference between two permissible judgements, but rather the result of a falsehood. *Id.*

Plaintiff repeatedly emphasizes the October 10, 2000 revelations that reserves would

---

[1] Medical care ratio, or medical cost ratio, is the ratio of the cost of providing medical services to members and the revenue received on health plans sold to members and their employers.

need to be increased approximately $25-30 million to account for a change in estimates regarding past costs as proof that the rosy statements regarding the transition to shared-risk contracts and the financial condition of PacifiCare generally were false when made. (*See* SCC ¶¶ 67,105.) This revision of past performance, however, is a classic example of a "sobering truth" that alone is insufficient to show the falsity of the statements when made. *See, e.g, Levine v. Safeguard Health Enter., Inc.*, 2000 WL 33115907, *5 (C.D. Cal. Sept. 12, 2000) (finding that restatements showing that earlier financial statements were inaccurate does not necessarily mean that the way the transactions were originally recorded was fraudulent). After all, as the October 10, 2000 statements themselves reveal, reserves are based upon estimates and the company's ability to accurately forecast uncertain claim trends and other medical costs. *See In re Ikon Office Solutions, Inc. Sec. Litig.*, 131 F. Supp. 2d 680, 702 (E.D. Pa. 2001) (noting that reserves are "essentially predictions about the future"). There are many factors, other than outright lying, that could account for the difference. The October 10, 2000 statements referenced higher inpatient utilization, insolvent providers, costs incurred to improve network stability, and loans and other settlements. (SCC ¶ 105.) Many of these factors are not addressed by the allegedly false statements. Thus, Plaintiff's reliance on the ultimate "admission" by Defendants regarding the financial condition of PacifiCare is not sufficient to show the falsity of their earlier, general optimistic statements. Plaintiff must point to contemporaneous documents or identify specific sources of information to show the falsity of the statements when made. *See Levine*, 2000 WL 33115907, *6.

### 1. Medicare

Again, Plaintiff points to the same general, optimistic statements regarding PacifiCare's Secured Horizons Medicare business. For instance, a conference call where Defendant Bowlus explained that "Our Harris acquisition combined with the success of our Secured Horizons price increases, the growth of our commercial products, and the continued efficiency improvements, bolster our confidence in meeting or exceeding our goals for growth." (SCC ¶ 83.) An Annual Report to shareholders specifically addressed Medicare concerns: "We believe that our Medicare franchise remains strong in spite of the Balanced Budget Act of 1997 (BBA) . . . Although we face tighter fiscal constraints than in the past, we also find ourselves with less competition due to the market exits of many of our Medicare+Choice counterparts. Simply put, we have been and expect to be able to succeed where others cannot." (SCC ¶ 87.) A May 2000 conference call emphasized that PacifiCare has been able to "hold a line on margins and retain a vast majority of [Medicare] members . . . we continue to add members to several markets, even in markets where we've added or increased member premiums . . . Medicare is a good business for PacifiCare." (SCC ¶ 92.)

Plaintiff argues that these statements are false because Defendants were aware that medical costs were increasing at a greater rate than Medicare payments, as result of the Balanced Budget Act of 1997. (*See* SCC ¶¶ 20, 97.) This difference was termed the "fairness gap" and was known to top management, according to "knowledgeable former PacifiCare employees." (SCC ¶ 59.) Further, according to former employees, the company was losing a lot of money trying to provide Medicare benefits during the Class Period. (SCC ¶ 59.) Thus, PacifiCare was planning to exit various

Medicare markets and freeze enrollment in others. (*See* SCC ¶¶ 62, 97.)

First, these allegations are not adequately detailed to provide an acceptable basis for Plaintiff's belief regarding the falsity of Defendants' Medicare statements. "A plaintiff must provide, in great detail, all the relevant facts forming the basis of her belief." *Silicon Graphics*, 183 F.3d at 985. "It is not sufficient for a plaintiff's pleadings to set forth a belief that certain unspecified sources will reveal, after appropriate discovery, facts that will validate her claim." *Silicon Graphics*, 183 F.3d at 985. However, accepting Plaintiff's allegations as true, including the generalized allegations regarding management's knowledge, they still do not persuasively show that PacifiCare's Medicare statements were false. A plan to exit certain Medicare markets and slow enrollment is not inconsistent with the general statements regarding PacifiCare's optimism for the Medicare market. It may simply be a sound business decision to temporarily, or even permanently, cut back on Medicare services because a smaller share of the market would support a profitable business. In *Ronconi v. Larkin*, for instance, the Court found that the plaintiff had failed to allege specific facts that showed how "problems" and "difficulties" translated into decreased revenues, which was supposedly at odds with statements of increased revenues. 253 F.3d 423, 434 (9th Cir. 2001). "Much of any business consists of having problems and dealing with them," but these problems do not necessarily suggest falsity or deception. *Id.* at 430. Similarly, Plaintiff has not alleged specific facts that show that exiting some Medicare markets and decreased membership necessarily results in overall unprofitability.

Moreover, upon attempting to analyze the falsity of the Medicare statements, the problems inherent in basing a claim on the forward-looking and general puffery statements that Plaintiff relies upon, emerges. PacifiCare did not say that it would not cut any enrollment, that it believed that the Balanced Budget Act posed no problems, or that it did not anticipate any problems with Medicare. Its statements were much more ambiguous. Furthermore, PacifiCare implicitly acknowledged that it would be losing Medicare business, (*See* SCC ¶ 92), specifically disclosed that it would exit from a number of counties, (*see* Def.'s 2RJN, Ex. B), and affirmatively stated that it believed the Balanced Budget Act created tighter financial constraints for the company, (SCC ¶ 92.).

### 2. *Capitation System to Shared-Risk System*

Again, Plaintiff relies upon the same general statements that were quoted in the CC, as the allegedly false statements regarding the transition from capitation contracts to shared-risk. For instance, Plaintiff first points to a press release that contemplated the future penetration of markets and the possibility of growth due to "our competitive advantages and our continuously improving cost and product advantages." (*Compare* SCC ¶ 74 *with* CC ¶ 51.) Next, a conference call where Defendants stated that the shift from capitation to shared-risk contracts was going smoothly and that they were confidant in the accuracy of their estimates regarding the medical cost ratio. (*Compare* CC ¶ 52 *with* SCC ¶ 75.) Similarly, Plaintiff references an analyst statement, issued after an alleged discussion with Defendants, stating that the transition from capitation to shared-risk was going smoothly with "no noticeable disruption to medical cost trend." (*Compare* CC ¶ 54 *with* SCC ¶ 76.) Plaintiff also points to a press release where PacifiCare informed the market that "we achieved our goal of EPS growth in

the 40 to 45 percent range, primarily due to the improved performance of our commercial line of business, and continued long-term stability in our medical care ratio." (SCC ¶ 81.)

Plaintiff initially alleges that PacifiCare did not have a competitive advantage over other health maintenance organizations, was not continuously improving in cost and product, and that the transition to shared-risk contracts was not going smoothly. (SCC ¶ 79.) There is no basis for these general allegations and the Court notes that they are as vague as the allegedly false statements. (*Id.*); *see Ronconi*, 253 F.3d at 431 (rejecting plaintiffs' contention that the statement was false because they did not "specify facts or evidence that show why the statement was false at the time it was made"). Notably, Plaintiff does not "describe, chart or graph" what actually occurred. *Id.* Despite increased costs, PacifiCare could be in a superior position relative to its smaller competitors who were also forced into shared-risk contracts but could not weather the increased costs. Likewise, perhaps the administrative switch to shared-risk contracts was going smoothly and providers and members were pleased with the transition. Plaintiff's allegations do not include the specific documents or facts necessary for showing falsity of the statements. *See Ronconi*, 253 F.3d at 431.

The heart of Plaintiff's argument regarding falsity, however, is that Defendants were aware during the Class Period of increased costs and inadequate reserves resulting from the transition to shared-risk contracts, but that Defendants did not disclose these facts or take adequate steps to protect the company's financial well-being. The SCC contains new allegations supporting this contention. "According to knowledgeable insiders working in the Company's Finance Department during the Class Period, the extent of PacifiCare's substantially increased costs under the shared-risk contracts was first quantified in 1998 and well known to upper management by mid-1999 and early 2000." (SCC ¶ 47.) By the start of the Class Period, 25% of PacifiCare's membership was under shared-risk contracts, thus Defendants knew that there would be a substantial negative cost impact from the transition to all shared-risk contracts. (*Id.*) According to "other knowledgeable insiders," before and during the Class Period, PacifiCare also tracked the medical cost ratio that quantified PacifiCare's increased costs under the shared-risk contracts. (SCC ¶ 50.) The medical cost ratio measures the ratio between costs and revenues and, Plaintiff alleges, this information was routinely passed up the chain of command at PacifiCare. (*Id.*) "Former employees" suggest that PacifiCare was told by McKenzie & Company that they would need to make staffing cuts to offset increases in medical service costs but that this would prevent PacifiCare from paying claims in a timely manner. (SCC ¶ 52.) Additionally, electronic spreadsheets were used to evaluate cost trends and to assist in quantifying costs. These were utilized by upper management and thus the increasing costs should have been of no surprise. (SCC ¶ 53.) Similarly, "monthly financial reporting and analytical reports" were submitted to individual Defendants and allegedly included "the costs increases PacifiCare was experiencing pursuant to the shared-risk contracts." (SCC ¶ 56.) Finally, individual Defendants were aware that the number of shared-costs contracts were increasing and that additional costs would continue to be incurred. (SCC ¶ 57.)

There are two problems with these allegations. First, the basis for each of the new allegations is simply "knowledgeable insiders" speaking in generalities. Aside from a meeting with

Defendant Alan R. Hoops where employees discussed an annual medical services cost increase of 17%, there are no references to particular documents, persons, meetings, or discussions that show increased costs. *See Silicon Graphics*, 183 F.3d at 985 (noting that allegations involving internal reports should include who drafted them, which officers received them, and an adequate description of their contents). In the absence of specifics regarding internal reports, the Court "cannot ascertain whether there is any basis for the allegations that the officers had actual or constructive knowledge . . . that would cause their optimistic representations to the contrary to be consciously misleading." *Id.* "Financial reports" and "spreadsheets" are not nearly particular enough to provide an adequate basis for inferring falsity. In *In re Guess?, Inc. Securities Litigation,* the court rejected allegations based upon internal reports and meetings where the plaintiff "provided no information as to who drafted these reports, what date the key reports or statements were made, what specifically the reports contained or any other corroborating details." 174 F. Supp. 2d 1067,1076 (C.D. Cal. 2001). Without specifics regarding the extent of the increased costs and their impact upon PacifiCare's overall well-being, there is little basis for the contention that such costs were not adequately accounted for at the time. *Guess?, Inc.*, 174 F. Supp. 2d at 1077 (noting that there were no specifics regarding when, where or how the company identified $30 million in inventory that was allegedly not accounted for in financial projections). The Court further notes that PacifiCare's press releases themselves cite increasing costs and wonder what material information was known and omitted. (*See* CC ¶¶ 51, 59.)

Second, the bare assertion that Defendants should have known that they were underestimating the increasing costs and the necessary reserves amount to the allegation that Defendants made a business mistake, not a fraudulent statement that investors relied upon. "Calling executives bad managers, or bad forecasters, does not plead fraud." *Ronconi*, 253 F.3d at 437. In *Ronconi*, for example, the plaintiff alleged that the company had experience problems consolidating sales forces and thus optimistic comments regarding a merger were false. 253 F.3d at 430. The court held, "it is difficult to see how claimed knowledge of problems consolidating sales forces is material. Much of any business consists of having problems and dealing with them." *Id.* Finally, Plaintiff has not related the general optimistic statements regarding PacifiCare's financial condition and future business, with knowledge that increasing costs were harming the company's financial situation.

### 3. Financial Statements

Plaintiff further argues that PacifiCare was not properly recognizing medical expenses and thus was overstating earnings for the third quarter of 1999. Plaintiff summarily alleges that PacificCare was delaying proper payment of medical claims and that there were violations of generally accepted accounting principles (GAAP), thus improper reporting of expenses and earnings. (*See, e.g.,* SCC ¶¶ 64-69.) There is no basis for these allegations, no examples of specific violations of GAAP or even an explanation of what Defendants did to violate GAAP, besides the general statement regarding the company's "failure to properly record medical expenses, including its under-accrual of 'incurred but not reported' costs." (SCC ¶ 68.) There is no mention of who knows this, how they know this, or

what specific costs were excluded. As remarked in *Guess?, Inc.*, "violations of GAAP are just as consistent with the existence of an accounting problem of unknown scope as they are with intentions to hide the performance of the company." 174 F. Supp. 2d at 1078. These allegations were discussed in reference to the CC and the Court then found that they were insufficient to show that the financial information was false when made and any glosses on the financial information is not actionable. (Order at 5.)

Plaintiff alleges that various state administrative agencies found that PacifiCare was not making timely payments, per state regulations, during the Class Period. This shows, Plaintiff contends, that PacifiCare was "pushing out" expenses during the Class Period to inflate earnings. The argument is unpersuasive. The mere fact that PacifiCare failed to make payments on claims during a regulatory time period is not proof that PacifiCare was underreporting costs in accounting documents. Viewing the allegation in the light most favorable to Plaintiff, there is, possibly, a tenuous link between untimely payments and delayed reporting of costs. But without a further explanation of accounting practices and the relationship between actual payment of medical claims and PacifiCare's accounting practices, this is insufficient to suggest that PacifiCare's reporting statements were fraudulent.

In sum, Plaintiff has failed to allege the falsity of Defendants' statements with sufficient particularity. However, even if the Court accepts these allegations as satisfying the PSLRA, Plaintiff has not met his burden to show scienter and that, alone, is a basis for dismissal of the complaint.

## C. Scienter

To satisfy the scienter prong of PSLRA, Plaintiffs allegations must present a "strong inference" of scienter, not direct proof. *Helwig v. Vencor*, Inc., 251 F.3d 540 (6th Cir. 2001). The allegations must show either that Defendants knew at the time of the false statements that they were false, or were reckless in not knowing the falsity.

### 1. Insider Stock Trading

Insider stock activity may be circumstantial evidence of knowledge of falsity and that statements were false when made. *Silicon Graphics*, 183 F.3d at 986. Factors to be considered include: (1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history. *Id.* at 986. Plaintiff's factual allegations regarding insider trading are identical to those in the CC. (*Compare* SCC ¶ 142 *with* CC ¶ 120.) Now, however, Plaintiff emphasizes the timing of the trades and PacifiCare's repurchase of UniHealth's shares. UniHealth is an institutional investor of PacifiCare.

Despite the fact that the Court previously held that the individual Defendants' trading was insufficient to show scienter, *(see* Order at 7-8), Plaintiff argues that the timing of the trades makes them probative evidence of scienter. The Court will not repeat its analysis of the trades, but reiterates that when options are accounted for, none of the speaking Defendants sold more than 15% of their

holdings. Two of the non-speaking Defendants, who are outside directors, sold the highest percentage of shares, 21.19% and 24.47%. (Order at 8.) These percentages are too low to be considered suspicious. (*Id.*); *see also Ronconi*, 253 F.3d at 435 (holding that sales by speaking defendants of 10% and 17% of their total number of shares and options was not suspicious). The timing of the sales is similarly insufficient to show scienter. Plaintiff argues that the sales occurred at a suspicious time, when the stock was at its maximum level of inflation and was outperforming the S&P Healthcare Composite. The Court, however, has already considered that these sales occurred during the Class Period and thus prior to the dramatic drop in share price. There are no allegations that the trades occurred at any particular time that could be linked to specific fraudulent statements, such as the day after a significant press release, or that they occurred when the share price was at its penultimate peak. (*See, e.g.,* SCC ¶ 142); *see Ronconi*, 253 F.3d at 435 (noting that the shares were sold at $52 but the peak was $73 during the relevant period). Plaintiff argues that trades made a "short time" before a negative announcement are suspicious, and thus evidence of scienter. The sales occurred over the span of the Class Period, however, which covers a year and there is no evidence that there was a rash of trading just before October 10, 2000. (*See, e.g.,* SCC ¶ 142 (listing the dates of trade, only two were somewhat close to the announcement, in August 2000, and the vast majority were several months before the announcement, in May 2000).) Thus, Plaintiff's argument is seriously undermined by the facts that Defendants' stock sales did not occur at the peak share price, (*see* SCC ¶¶ 4, 142), did not occur just before or after a significant announcement, and that PacifiCare's shares rebounded after the dramatic drop at the end of the Class Period.

Plaintiff additionally argues that PacifiCare's repurchase of a significant number of UniHealth's shares is evidence of scienter. UniHealth had a contract with PacifiCare that required PacifiCare to repurchase its stock at predetermined "trigger" prices. Plaintiff contends that UniHealth wanted to diversity its holdings and that, through its connections with PacifiCare's board, it forced PacifiCare to repurchase the stock. Plaintiff argues that Defendants artificially inflated PacifiCare's stock price so that UniHealth could exercise its put option and require PacifiCare to repurchase 750,000 shares of UniHealth's stock at the artificially inflated price. Plaintiff asserts that despite the inflation, UniHealth sold at less than the price specified in the option agreement, and contends this is strong evidence that it was aware of the adverse conditions plaguing PacifiCare.

It is unclear to the Court why PacifiCare would make false statements to artificially inflate its share price in order to then repurchase a large amount of stock at that artificially high price. Although there is some indication that UniHealth and PacifiCare had a few overlapping directors, (SCC ¶ 141) they form a minority of the PacifiCare board and that simple fact does not support an inference that PacifiCare would act to its detriment merely to advantage an institutional investor. Further, there are many reasons why UniHealth would accept a lower price than originally bargained for. At the top of the list is the very reason that Plaintiff includes in the complaint, which is that UniHealth wished to diversify its holdings. Moreover, despite Plaintiff's attempt to cast doubt upon the sale due to its timing, it occurred six weeks prior to the October 10, 2000 announcement. This is not especially suspicious timing. At best, this is a strained argument that some UniHealth directors exercised control over the PacifiCare board. *See also supra* Part II.D. It is not, however, evidence that

PacifiCare knew its statements, which are primarily optimistic, forward-looking generalities, were false when made.

### 2. Other Indicia of Scienter

The Court previously dismissed Plaintiff's argument that the fact that several of the Defendants were "hands-on" managers is sufficient indicia of scienter. (Order at 8.) Similarly, the Court rejected Plaintiff's argument that a cease and desist order from the California Department of Managed Care supports an inference that Defendants knew or should have known that there were problems with claims processing during the Class Period. (Order at 9.) This Court found that even if Defendants took corrective steps related to inadequate claims processing during the Class Period, it does not follow that the individual Defendants "knew that the underlying problems rendered any positive statements false." (*Id.*)

One of Plaintiff's new allegations in this area is that the Oregon Department of Consumer and Business Services also found that PacifiCare made untimely payments of claims on a regular basis. In March 1999, the Oregon administrative agency found that in 37% of the claim filed examined PacifiCare failed to acknowledge or pay a claim within 20 days after being notified. Plaintiff thus argues that months prior to the Class Period, Defendants were placed on notice that PacifiCare wrongfully delayed paying claims. According to Plaintiff, such notice shows that Defendants knew that the financial statements released during the Class Period were false because the company had a history of untimely payment. Defendants therefore should have known that they were fraudulently failing to report incurred costs, which effected the reported earnings and eventually led to the disastrous October 10, 2000 revisions in estimated costs and resulting reserves. Despite some logic in Plaintiff's reasoning, it is far too attenuated to constitute a sufficient showing of scienter. As previously explained, payments that are untimely according to a state regulatory time period are not necessarily being fraudulently accounted for in financial statements. Furthermore, the knowledge of untimely payments several months prior to the Class Period does not mean that Defendants knew there were similarly untimely payments during the Class Period. Sufficient time elapsed that PacifiCare could have made changes to its administrative system that it believed would solve the problem.

Finally, Plaintiff now alleges that in a Texas class action, brought by physicians against PacifiCare for untimely claims, the Texas State Court District Judge granted a temporary restraining order against PacifiCare. (SCC ¶ 150.) On May 12, 2000, the Judge granted the temporary restraining order based upon the class action's allegations that PacifiCare was purposely delaying claim payment to physicians beyond the 45 days of receipt, as required by Texas law. The mere issuance of a temporary restraining order, however, is not a conclusive finding regarding Defendants' behavior. Otherwise, temporary restraining orders would obviate the need to continue with the lawsuit. Moreover, Plaintiff cannot rely upon allegations in other lawsuits but must conduct his own independent analysis of the facts and law. Additionally, the same flaw exists in this allegation as in the other allegations regarding delayed or untimely payment. This does not support an inference that Defendants were fraudulently reporting medical costs and that PacifiCare's positive statements

regarding the financial condition of the company were false when made. Even in combination with the California administrative findings, Plaintiff's additional allegations regarding delayed payments are unpersuasive indicia of scienter. As the *Silicon Graphics* court noted, the plaintiff must "state facts giving rise to a strong inference of deliberate recklessness or intent. It is not enough for [the plaintiff] to state facts giving rise to a mere speculative inference of deliberate recklessness, or even a reasonable inference of deliberate recklessness." 183 F.3d at 985; *see also* 15 U.S.C. § 78u-4(b)(2).

In sum, Plaintiff's strained arguments of scienter do not make up for the deficiencies in the complaint. Quite simply, Plaintiff has failed to allege an essential element of securities fraud. Without scienter, Plaintiff's complaint amounts to allegations of mismanagement, bad business judgment, and bad luck. The Court cannot condone the continuation of this action in light of the clear directives of the PSLRA and the Ninth Circuit to strictly construe complaints to prevent the harmful consequences of unfounded fishing expeditions.

### D. Individual Defendants and UniHealth

Section 20(a) provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of [the Securities and Exchange Act] or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person." 15 U.S.C. § 78t(a). Thus, the plaintiffs must allege (1) a primary violation of the federal securities laws, and (2) that the defendants possessed, directly or indirectly, power or control over the primary violator. *See, e.g., Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000); *Splash Tech. Holdings,* 2000 WL 1727405, at *15. Plaintiff here has not alleged a primary violation of the federal securities laws as Plaintiff has not sufficiently alleged scienter. Thus, any further analysis is moot.

The Court additionally finds that Plaintiff has not sufficiently alleged that UniHealth is a controlling person, such that its actions or knowledge could be imputed to the individual Defendants or Pacificare. The question is "whether the defendant, acting alone or as a member of an identifiable group, had the power or influence to direct significant aspects of the management of the corporation." *Splash Tech. Holdings, Inc.*, 2000 WL 1727405, at *16. The determination of who is a controlling person is an "intensely factual question," involving participation in day-to-day operations and control over corporate actions. *Kaplan v. Rose,* 49 F.3d 1363, 1382 (9th Cir. 1994); *Arthur Children's Trust v. Keim,* 994 F.2d 1390, 1396 (9th Cir. 1993). In *Howard v. Hui,* for example, the court found that plaintiffs had not sufficiently alleged control as there were no allegations that defendants were active in the day-to-day affairs of the corporation or that they exercised any specific control over financial statements. 2001 WL 1159780 at *4. Similarly, in *Splash Technologies Holding*, the court pointed to the fact that no specific act of control was alleged and dismissed the section 20(a) claims against a shareholder and outside director. 2000 WL 1727405, at *16. Three of UniHealth's directors are also on the Board of PacifiCare. This, however, is a minority of the Board and directors are not generally involved in the day-to-day operation of the company. Additionally, there are no allegations of specific acts of control. Thus, UniHealth is not a controlling person. *See In re Gupta Corp. Sec. Litig.*, 900 F.

Supp. 1217, 1243 (N.D. Cal. 1994) (noting that despite the fact that the allegations of control liability should be construed liberally, "Plaintiffs' claims against these defendants are conclusory; plaintiffs allege no facts to support their allegations of control"). No act or statement of UniHealth's is alleged other than the sale of stock. Plaintiff has not alleged a securities fraud violation against UniHealth.

## III. CONCLUSION

For the reasons set forth above, the Court GRANTS both Defendant PacifiCare Health Systems, Inc and the Individual Defendants' motion to dismiss and Defendant UniHealth Foundations' motion to dismiss the second consolidated class action complaint. As Plaintiff has already been given an opportunity to amend in accordance with this Court's directives, and has again failed to adequately plead a violation pursuant to the PSLRA, Plaintiff is not granted leave to amend.

The Clerk shall serve this minute order on all parties to the action.